UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CRIMINAL ACTION NO. 3:16-CR-00011-TBR

UNITED STATES OF AMERICA            PLAINTIFF

v.

DENNIS AMMONS            DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Dennis Ammons's Motion to Dismiss Count 2 of the Indictment on the grounds of outrageous government conduct. [R. 50.] Plaintiff United States of America responded. [R. 54.] Fully briefed, this matter is ripe for adjudication. For the reasons stated herein, Ammons's Motion to Dismiss [R. 50] is **DENIED.**

**BACKGROUND**

This matter arises out of Defendant Dennis Ammons's Motion to Dismiss Count 2 of the Indictment, which charged him with knowingly receiving child pornography, in violation of Title 18, United States Code, Sections 2252A(a)(2)(A) and 2252A(b)(1). [R. 9 at 1 (Ammons Indictment).] Ammons argues that the conduct of the Federal Bureau of Investigation ("FBI") in investigating the website Playpen, of which he was allegedly a registered user, was so outrageous that it violated the Due Process Clause of the Constitution. [*See* R. 51 (Ammons Memorandum for Motion to Dismiss).] Further detail on this investigation may be found in this Court's Memorandum Opinion and Order denying Ammons's Motion to Suppress. [R. 36.]

**DISCUSSION**

The due process defense asserted by Ammons grew out of dicta in *United States v. Russell*, in which the Supreme Court speculated: "[W]e may some day be presented with a

1

situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . ..." 411 U.S. 423, 431-32 (1973) (citation omitted).[1]

The Sixth Circuit acknowledged two approaches to this outrageous conduct defense. At first, the Sixth Circuit defined four factors to guide the determination of whether police conduct violated due process principles. "These factors are: (1) the need for the type of government conduct in relationship to the criminal activity; (2) the preexistence of a criminal enterprise; (3) the level of the direction or control of the criminal enterprise by the government; (4) the impact of the government activity to create the commission of the criminal activity." *United States v. Johnson*, 855 F.2d 299, 304-305 (6th Cir. 1988) (citing *United States v. Robinson*, 763 F.2d 778, 785 (6th Cir. 1985); *United States v. Norton*, 700 F.2d 1072, 1075 (6th Cir. 1983); *United States v. Brown*, 635 F.2d 1207, 1213 (6th Cir. 1980). "These factors are for guidance only, and therefore, the presence of each factor need not be shown." *United States v. Foster*, 835 F. Supp. 360, 365 (E.D. Mich. 1993) (citing *United States v. Barger*, 931 F.2d 359, 363 (6th Cir. 1991)).[2]

Fourteen years and many rejections later, the Sixth Circuit decided there was no authority to support this "outrageous conduct" defense when the defendant claims the government induced the commission of the crime: "In our view, therefore, there is no authority in this circuit which holds that the government's conduct in inducing the commission of a crime, if 'outrageous' enough, can bar prosecution of an otherwise predisposed defendant under the Due Process Clause of the Fifth Amendment." *United States v. Tucker*, 28 F.3d 1420, 1424 (6th Cir. 1994);

---

[1] As an example of what could be perceived as "outrageous conduct" on behalf of the government, the Supreme Court cited to the case of *Rochin v. California*, in which officers forced entry into the defendant's bedroom and directed a doctor to pump his stomach to retrieve two capsules of morphine. *Russell*, 411 U.S. at 432 (citing *Rochin v. California*, 342 U.S. 165, 166 (1952)).

[2] Furthermore, other circuits have recognized that establishing outrageous government conduct is a "very heavy burden." *See United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (quoting *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999)); *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).

*see also United States v. Warwick*, 167 F.3d 965, 974 (6th Cir. 1999) (holding that when the defense "sounds in inducement" of the commission of a crime, the Sixth Circuit has held that the defendant "cannot avail himself of the 'outrageous government conduct' defense") (quoting *Tucker*, 28 F.3d at 1421). The Sixth Circuit also stated that the outrageous government conduct defense is not available "on a theory that the 'undercover officer's involvement in creating [the] crime was so significant that criminal prosecution violates due process.'" *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (quoting *Warwick*, 167 F.3d at 975). Other circuits join the Sixth Circuit in these sentiments. *See United States v. Boyd*, 55 F.3d 239, 241 (7th Cir.) (characterizing the doctrine for outrageous governmental conduct as " 'stillborn' . . . for it never had any life"); *United States v. Santana*, 6 F.3d 1, 3-4 (1st Cir. 1993) ("Outrageous misconduct is the deathbed child of objective entrapment, a doctrine long since discarded in the federal courts.").

In this case, Ammons argues two types of government action occurred that are so outrageous as to require dismissal of an indictment: (1) the government supplied or became intimately involved in contraband and (2) the government's conduct resulted in injuries to innocent third parties. [R. 51 at 6.]

**A. Availability of the "Outrageous Government Conduct" Defense**

It is doubtful that the outrageous government conduct defense should apply to the first type of government action asserted by Ammons. As explained earlier, this defense is not available "where the defense is based either on a theory of government inducement or on a theory that the 'undercover officer's involvement in creating [the] crime was so significant that criminal prosecution violates due process.'" *Blood*, 435 F.3d at 629 (quoting *Warwick*, 167 F.3d at 975) (citation omitted). Although Ammons does not claim any inducement occurred, he does

3

suggest that the government's involvement in the website, Playpen, was so significant that a criminal prosecution would violate due process. Specifically, Ammons claims the government engaged in a type of action in which "the Government supplies contraband, or becomes intimately involved in its production." [R. 51 at 6 (quoting *United States v. Thoma*, 726 F.2d 1191, 1199 (7th Cir. 1984)).] Ammons implies that by allowing Playpen to stay online, the government became "intimately involved" in the illegal activity that occurred. [*See Id.* at 6, 8-9.] This type of government involvement is analogous to the facts of *Blood*, in which the defendants claimed it was outrageous conduct when an FBI informant developed an investment program in order to bring the defendants from California to Nashville so he could collect their counterfeit securities. 435 F.3d at 629-630. In both cases, the government became significantly involved in the illegal activity, be it Playpen or an investment program. Just as the Sixth Circuit concluded in *Blood*, Ammons's allegation cannot support a claim for outrageous government conduct because it is based on the theory that the government's involvement in Playpen was "so significant that criminal prosecution violates due process." *Id*.

### B. Four Factor Determination

Even if the outrageous government conduct defense is not available for Ammons's first argument, the second argument still remains for the Court to decide. Out of an abundance of caution, the Court will analyze both of Ammons's arguments using the four considerations supplied by the Sixth Circuit. In short, after applying the four factor test, the Court finds that the government's conduct does not rise to the level of egregiousness required to dismiss Count 2 of the Indictment.

The first factor to be considered is "the need for the type of government conduct in relationship to the criminal activity." *Johnson*, 855 F.2d at 304-05. In *Johnson*, the Sixth Circuit

stated that "the transmission of child pornography through the mails occurs within a shroud of secrecy," making the government's use of a magazine ad and personal correspondence necessary to catch criminals. *Id.* at 305. The utilization of "The Onion Router" network (or "Tor," for short) to disguise both Internet users and websites in this case creates a "shroud of secrecy" much more opaque and enveloping than the comparatively simple use of the mail in *Johnson*. [*See* R. 24-2 at 15-16 (Affidavit in Support of Application for Search Warrant).]  Furthermore, the Sixth Circuit previously stated that "[g]overnment undercover operations are severely needed to prevent and deter those who produce, sell, purchase or traffic in child pornography." *United States v. Moore*, 916 F.2d 1131, 1139 (6th Cir. 1990).[3] Therefore, the need for the government conduct in relation to the criminal activity in this case was justified.

The second factor to be considered is "the preexistence of a criminal enterprise." *Johnson*, 855 F.2d at 305. In Sixth Circuit precedent, this factor usually weighs in favor of the government when a legal search of the defendant's home yields evidence of receiving or distributing child pornography. *See, e.g., Moore*, 916 F.2d at 1139 ("[P]rior to contacting the undercover officers, Moore maintained a hard core pornography library, including photographs of minors engaged in sexually explicit conduct."); *United States v. Porter*, 709 F. Supp. 770, 781 (E.D. Mich. 1989) ("A search incident to the lawful arrest of Surin revealed the existence of a mailing list apparently utilized by Surin to distribute pornography through the mail."); *United States v. Davis*, No. 3:06-CR-31-S, 2006 WL 2355848, at *2 (W.D. Ky. 2006) (Simpson, J.) ("Additionally, the search yielded other child pornography in the form of four albums of photos found in Davis's residence."). In this case, Ammons admitted that he looked at child pornography "for research reasons" and directed the FBI agents to a laptop and a computer in his bedroom as possible

---

[3] In *Moore*, the Sixth Circuit held that the government did not engage in outrageous conduct when undercover agents corresponded with the Defendant and sent child pornography to him in a controlled delivery. 916 F.2d at 1138-39.

candidates for harboring such photos. [R. 1 at 5 (Criminal Complaint).] However, a preview conducted on those devices did not show any images in active file content. [*Id.*] Although this fact pattern strays from those of precedent, Ammons's admission to receiving child pornography at the time of the search, as well as the evidence that he registered a username and accessed child pornography on Playpen, [*Id.*], compensates for the fact that agents did not immediately find child pornography at his home.

Furthermore, as reported by the United States in its Response, [R. 54 at 6], Playpen existed well before the FBI began its investigation. In *United States v. Skotzke*, the district court found the "preexistence of a criminal enterprise" in a case involving the receipt of child pornography from a website, PedoShop, because "the PedoShop website existed and was in operation prior to [the agent's] discovery of the site and would have continued with or without his undercover activity." *Skotzke*, No. 06-20475, 2007 WL 703398, at *6 (E.D. Mich. March 1, 2007). Similarly, in this case, Playpen existed and operated before the FBI discovered the site, [*See* R. 24-2 at 25], therefore, the second factor weighs in favor of the United States.

The third factor considered by the Sixth Circuit is "the level of the direction or control of the criminal enterprise by the government." *Johnson*, 855 F.2d at 305. This factor gets at the heart of Ammons's argument that the FBI's conduct was outrageous when it continued the operation of Playpen. [R. 51 at 8.] In the context of the third factor, the Sixth Circuit stated: "the mere supplying of a crucial ingredient or means to commit a crime by itself does not violate due process." *Robinson*, 763 F.2d at 785 (citing *Hampton v. United States*, 425 U.S. 484, 488 (1976) (Rehnquist, J., plurality opinion); *Russell*, 411 U.S. 423 (1973); *Norton*, 700 F.2d at 1076; *United States v. Leja*, 563 F.2d 244 (6th Cir.1977) (per curiam)). Furthermore, the Sixth Circuit noted "the Supreme Court has repeatedly emphasized that the police may use artifice and

6

stratagem." *Id*. This is precisely what the government did in the past by engaging in correspondence with defendants and conducting controlled deliveries of child pornography to them. *See, e.g., Moore*, 916 F.2d at 1135 (holding that it was not outrageous government conduct when an agent performed a controlled delivery of child pornography to the defendant); *Davis*, 2006 WL 2355848 at *1 (same); *Porter*, 709 F. Supp. at 781 (holding that it was not outrageous government conduct when the government mailed out solicitation lists for child pornography).

Ammons argues the government surpassed acceptable "stratagem" by allowing Playpen to continue operating in order to identify its users. [R.51 at 8-9.] Specifically, Ammons claims that "the government flooded the internet with thousands of images of child pornography." [*Id*. at 9.] This is inaccurate. The government did take control of the website, however, it was only to perform a type of sting operation in which the FBI used a network investigative technique ("NIT") that would instruct a user's computer to transmit certain information to the FBI after the user logged on to Playpen. [R. 24-2 at 28 ¶¶ 32-33.] Furthermore, the FBI did not post a single image, video, or link to child pornography. [R. 51-2 at 5-6 (United States' Response to Order Compelling Discovery from *United States v. Michaud*).] In support of his claims, Ammons fails to provide case law in which the government was actually guilty of outrageous conduct. Instead, he compares the case at hand to precedent in which the government delivered child pornography to defendants. [*See* R. 51 at 7-9 (citing *Johnson*, 855 F.2d at 304-305; *United States v. Duncan*, 896 F.2d 271 (7th Cir. 1990); *Davis*, 2006 WL 2355848).] The Court finds that the government's actions in this case align more with that of the government in *Moore*, *Davis*, and *Porter* than Ammons's description in which the FBI "flooded the internet" with child pornography. Therefore, the third factor weighs in favor of the United States.

The last factor for consideration is "the impact of the government activity to create the commission of the criminal activity." *Johnson*, 855 F.2d at 305. The fact that users of Playpen were still able to download and share these videos and images even after the FBI took control of the website is deeply troubling. However, Ammons rightly cites to *Johnson*, which weighed the fourth factor in the government's favor because there was no evidence that the government's tactics "disproportionately increased the incidence of transmitting obscene materials through the mail." 855 F.2d at 305. Similarly, Ammons asserts that the FBI's control of Playpen disproportionately increased the amount of Playpen users and childhood pornography, but he does not cite any source to support this claim. [R. 51 at 8.][4]

It is true that the FBI could have immediately shut down the website. However, allowing the website to operate for fourteen days was necessary in order to run the NIT, which identified the users of the site who would have remained concealed otherwise through the use of Tor. [R. 51-2 at 6.] Furthermore, while Playpen was under the FBI's control, "FBI Special Agents monitored all site postings, chat messages, and private messages twenty-four hours per day in order to comply with Title III monitoring requirements and in order to assess and mitigate any risk of imminent harm to children." [*Id.*] Lastly, we must not forget that the FBI had a warrant to run this NIT—this was no rogue operation. [R. 24-2 at 2.] In order for the FBI to identify and apprehend these users, and therefore prevent the future exploitation of children, the FBI deployed a new type of stratagem—with a warrant. With no proper support for Ammons's

---

[4] It appears that Ammons incorrectly quotes from Exhibit 2 to his Motion to Dismiss in stating that there were an *additional* 900 images and 200 videos between February 20 and March 4, 2015 when, in fact, these were the amounts of files *recovered* by the FBI. *See 51-2* at 3.

claims and a clear need for this type of investigation in order to stop this heinous crime, the Court finds that the fourth factor weighs in favor of the government.[5]

### C. Courts that have Considered this Issue

It should be noted that this Court is not the first to face this issue in the context of the Playpen investigation. The Court stands in good company in its decision to deny a motion to dismiss an indictment based on an outrageous government conduct defense. *See, e.g., United States v. Vortman,* No. 16-CR-210, 2016 WL 7324987, at *1 (N.D. Cal. Dec. 16, 2016); *United States v. Hammond*, No. 16-CR-102, 2016 WL 7157762, at *6 (N.D. Cal. Dec. 8, 2016); *United States v. Owens,* No. 16-CR-38, 2016 WL 7079617, at *5 (E.D. Wis. Dec. 5, 2016); *United States v. Anzalone*, 2016 WL 6476939, at *5 (D. Mass. Oct. 28, 2016); *United States v. Allain*, No. 15-CR-10251, 2016 WL 5660452, at *13 (D. Mass. Sept. 29, 2016); *United States v. Chase*, 15:15-CR-00015, 2016 WL 4639182 at *2 (W.D.N.C. Sept. 6, 2016).

### D. The Adam Walsh Act

Lastly, Ammons claims that the FBI violated the Adam Walsh Act by allegedly "disseminating child pornography outside of the government." [R. 51 at 10.] The cited portion of the Adam Walsh Act states: "In any criminal proceeding, any property or material that constitutes child pornography (as defined by section 2256 of this title) shall remain in the care, custody, and control of either the Government or the court." 18 U.S.C. § 3509(m)(1). There are two reasons why it is incorrect to apply this statute to Ammons's case: First, as previously explained, the FBI never posted or distributed child pornography [R. 51-2 at 5-6], therefore, the FBI could not have "disseminat[ed] child pornography outside of the government." Secondly, §

---

[5] The Court recognizes that the Playpen investigation "broke new ground," as the United States phrased it, when it allowed users to continue to download and share illegal content. However, even if this fourth factor weighed in favor of Ammons, "[t]hese factors are for guidance only, and therefore, the presence of each factor need not be shown." *Foster*, 835 F. Supp. at 365 (citing *Barger*, 931 F.2d at 363). Thus, the presence of the preceding three factors still results in a decision favoring the United States.

3509(m) covers the issue of a defendant having ample opportunity to examine the evidence against him or her in a child pornography case. Specifically, § 3509(m)(1) requires material containing child pornography to remain in the custody of the government, unless it is not made reasonably available to the defendant. *See, e.g., United States v. Hornback*, No. 3:10-13-DCR, 2010 WL 468944, at *1-3 (E.D. Ky. Nov. 8, 2010) (citing § 3509(m)(1) in the context of an evidentiary dispute); *United States v. Gutierrez*, 625 F. App'x 888, 891-92 (10th Cir. 2015) (same); *United States v. McNealy*, 625 F.3d 858, 867-68 (5th Cir. 2010) (same); *United States v. Griesbach*, 540 F.3d 654, 656 (7th Cir. 2008) (same). Clearly, Ammons's use of § 3509(m)(1) falls outside the evidentiary scope of the statute and, therefore, it is inapplicable to this case.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Count 2 of the indictment [R. 50] is **DENIED**.